**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

TOYA GREEN-MOBLEY,

        Plaintiff,

v.                            CASE NO:  3:17-cv-764-J-34JBT

CAPITAL ONE AUTO FINANCE, INC.,

        Defendant.

---

**TOYA GREEN-MOBLEY'S RESPONSE IN OPPOSITION TO COAF'S MOTION FOR**
**SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

        TOYA GREEN-MOBLEY ("Ms. Green-Mobley" or "Plaintiff"), responds in opposition

to CAPITAL ONE AUTO FINANCE, INC.'s ("COAF" or "Defendant") Motion for Summary

Judgment [DE 65] (the "Motion") and, in support, states:

## I.    STATEMENT OF FACTS[1]

### A.  **Mrs. Green-Mobley's Credit Application and Contract with COAF**

        Mrs. Green-Mobley listed her home phone number on a Credit Application for a line of

credit to purchase a vehicle. [*Application*, DE 32-1, p. 8 of 49].  The Credit Application was

entirely separate from any contract and was <u>not</u> incorporated into the Retail Installment Contract

("Contract"). [*See Contract*, DE 32-1, pg. 10-13 of 49].   The Contract was assigned to COAF, but

the Credit Application was not. [*Def.'s Mot.*, DE 65, p. 5].  The Contract did not have a contractual

provision restricting Mrs. Green-Mobley's ability to revoke consent.

### B.  **Calls to Mrs. Green-Mobley's Cellular -6433 Telephone Number**

        Mrs. Green-Mobley is the regular user and subscriber of cell phone number ending in -

---

[1] COAF did not number its "undisputed facts" section. We will discuss the pertinent disputed facts in the same manner.

6433.  COAF called Mrs. Green-Mobley's cell phone number at least 1,100 times between July 6, 2013, and July 6, 2017, for the purpose of collecting a debt. [*Def.'s Third-Am. Resp. to Ct.-Ordered Interrogs.*, DE 51, No. 1].  Mrs. Green-Mobley's Activity Notes reflect at least thirty-nine (39) additional calls not recorded on the call logs. *Id.*

COAF made at least nine hundred and ninety-six (996) calls to Mrs. Green-Mobley's cellular telephone number -6433 using the Avaya Proactive Contact dialer (the "Avaya Proactive Contact dialer"). [*See Def.'s Bates 000261-000282,* Ex. A; *Def.'s Bates 000476-000510*, Ex. B; *Def.'s Supp. Resp. to Pl.'s First Set of Interrogs.*, No. 10, Ex. C].

Although Mrs. Green-Mobley installed a call blocking application on her cell phone, she still received notifications to her cell phone every time COAF called. [*Pl.'s Dep. Tr.*, DE 72-2, 306:16-22; 256:18-24 ("[i]t gives one ring, but blocking it stop[ped] the calls – the phone from ringing over and over and over and over and over again.")].

### C.  COAF's Telephone Systems

Prior to April 1, 2016, COAF alleges that it used both the Avaya Proactive Contact dialer and the Avaya one-X dialer but that it solely used and continues to use the Avaya one-X dialer post April 1, 2016.[2]  COAF previously admitted to "plac[ing] certain calls to Plaintiff with technology that meets the Federal Communications Commission's (FCC) current interpretation of what constitutes an automatic telephone dialing system as defined by 47 U.S.C. § 227(a)(1)(A)." [*Def.'s Resp. to Ct.-Ordered Interrogs.*, DE 16, No. 2; *Def.'s Am. Resp. to Ct.-Ordered Interrogs.*, DE 29, No. 2; *Def.'s Second Am. Resp. to Ct.-Ordered Interrogs.*, DE 40, No. 2].  On February 11, 2019, COAF responded to Mrs. Green-Mobley's Third Request for Admissions stating that "COAF admits that at certain times during the relevant time period in this case, **calls were placed**

---

[2] Mrs. Green-Mobley's concern is the APC dialer used prior to April 1, 2016.

**without a COAF employee manually dialing each number**." [*Def.'s Resp. to Pl.'s Third Req. for Admis.*, No. 49, Ex. D (emphasis added)]. Yet, COAF's expert testified that "**Proactive Contact was not used without human intervention** . . . ." [*Dep. Tr. of J. Kostyun*, 120:17-20, Ex. E (emphasis added)].

COAF further admits that it used the Avaya Proactive Contact dialer in predictive mode. Predictive dialing comes standard with the Avaya Proactive Contact dialer, and COAF used predictive mode to place calls prior to April 1, 2016. [*Dep. Tr. of J. Kostyun*, 26:6-7; 63:1-5; 73:4-7; 89:12-13, 17-25; 103:10-13; 105:21-25, Ex. E; *Dep. Tr. of E. Gray*, 272:12-23, Ex. F]. Specifically, COAF's expert testified that "[i]t's my understanding from the review of COAF's information, that they **did** use Proactive Contact prior to April 2016 in predictive dialing mode." [*Dep. Tr. of J. Kostyun*, 103:10-13, Ex. E (emphasis added)].[3]

**D.   Mrs. Green-Mobley's Seven Revocation Letters**

The testimony and evidence produced is that from September 2013 through May 2017, Mrs. Green-Mobley sent COAF at least seven (7) written revocation letters requesting that COAF stop calling her: **(1)** *September 15, 2013 Revocation Letter.* Mrs. Green-Mobley mailed a revocation letter to COAF dated September 15, 2013 ("First Letter"). [*Aff. of Pl.*, DE 38-5, ¶ 16; *Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 34:1-16].[4] **(2)** *January / February 2014 Revocation Letter.* She mailed a revocation letter to COAF in or around January or February of 2014 ("Second Letter"). [*Pl.'s Dep. Tr.*, DE 72-2, 41:22-23].[5] **(3)** *January 14, 2016 Revocation Letter.* Mrs. Green-Mobley

---

[3] COAF offers no explanation why it contends that "Mr. Snyder is making the assumption that COAF used Proactive Contact in predictive mode without having any information to support that," [*Dep. Tr. of J. Kostyun*, 72:13-15, Ex. E], yet also states through its own expert that COAF did use the APC dialer in predictive mode. [*Dep. Tr. of J. Kostyun*, 103:10-13, Ex. E].

[4] Mrs. Green-Mobley enclosed a SunTrust Layoff Letter with the First Letter to notify COAF that she had been laid off and that she could only make partial payments due to her unemployment. [*Compl.*, DE 1-3; *Pl.'s Dep. Tr.*, DE 72-2, 32:8-10; 34:4-7].

[5] Mrs. Green-Mobley is currently not in possession of the Second Letter.

mailed another revocation letter to COAF dated January 14, 2015 ("Third Letter").[6] [*Aff. of Pl.*, DE 38-5, ¶ 18]. **(4) *September 2016 Revocation Letter.*** She mailed another revocation letter to COAF in September 2016 ("Fourth Letter"). [*Aff. of Pl.*, DE 38-5, ¶ 18; *Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 41:5-6; 287:14-15].[7] **(5) *February 13, 2017 Revocation Letter.*** Mrs. Green-Mobley mailed another revocation letter to COAF on or about February 13, 2017 ("Fifth Letter"). [*Aff. of Pl.*, ¶ 18; DE 1-5; *Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 15:11-25; 16:1-12; 287:14-15]. **(6) *March 17, 2017 Revocation Letter.*** Mrs. Green-Mobley mailed another revocation letter to COAF on or about March 17, 2017 ("Sixth Letter"). [*Aff. of Pl.*, DE 38-5, ¶ 18; *Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 18:17-25; 19:1-11; 287:14-15]. **(7) *May 12, 2017 Revocation Letter.*** Mrs. Green-Mobley mailed another revocation letter to COAF on or about May 12, 2017 ("Seventh Letter"). [*Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 21:2-20; 287:14-15].

## II.  ARGUMENT AND CITATION OF AUTHORITY

### A.  COAF VIOLATED EACH ELEMENT OF THE TCPA

COAF agrees that, under the TCPA "[t]o establish a violation, Plaintiff must show that '(1) a call was made to a cell or wireless phone, (2) by the use of any automatic dialing system **or** an artificial **or** prerecorded voice, and (3) without prior express consent of the called party.'" [*Def.'s Mot.*, p. 14-15, section IV, subsection A (quoting *Augustin v. Santander Consumer USA, Inc.*, 43 F. Supp. 3d 1251, 1253 (M.D. Fla. 2012) (emphasis added))].

### 1)  *Element One: There is No Dispute That Element One is Satisfied*

---

[6] While the copy of the original is dated "January 14, 2015," Mrs. Green-Mobley testified that "[i]t was an error going from 2015 into 2016. The letter was created in 2016. It was just a typo." [*Pl.'s Dep. Tr.*, DE 72-2, 326:22-25]. There is no dispute that the year was indeed a typo because Mrs. Green-Mobley sent Synchrony Bank a similar letter around this time ("Synchrony Letter"), and Synchrony Bank stamped the revocation letter stating that it "Received" the revocation letter on January 28, 2016. [*Synchrony Ltr.*, attached as Ex. G].

[7] Mrs. Green-Mobley is currently not in possession of the Fourth Letter.

COAF does not dispute that Mrs. Green-Mobley is the owner, regular user, and subscriber of the cellular telephone COAF called in violation of the TCPA.  "COAF does not dispute that the 6433 number was Plaintiff's cell phone" and that "during the four-year period before this suit was filed, COAF made numerous calls to that number." [*Def.'s Mot.*, p. 15, section IV, subsection A].

### 2)   *Element Two:  The Avaya Proactive Contact Dialer is An Autodialer. COAF Also Made Calls Using A Prerecorded and/or Artificial Voice.*

COAF argues that it did not use an autodialer.  Yet, just a few months ago, COAF admitted under oath to the Court that it did. [*See Def.'s Second Am. Resp. to Ct.-Ordered Interrogs.*, DE 41, No. 2].  COAF now argues that the Avaya Proactive Contact dialer is not considered an autodialer based on the post-*ACA International* case, *Gonzalez v. Ocwen Loan Servicing, LLC*, No. 5:18-CV-340-OC-30PRL, 2018 WL 4217065 (M.D. Fla. Sept. 5, 2018). However, even post-*ACA Int'l*, numerous courts have found that **this exact dialer** (Avaya Proactive Contact) is an autodialer.  In addition, COAF's own TCPA expert, corporate representative, and employee have testified that the Avaya Proactive Contact dialer has the functionalities of an autodialer, left prerecorded "scripted" messages, and indeed was used to place calls to consumers in predictive mode prior to April 2016.  Plaintiff's expert submitted testimony and reports that the system qualifies as an autodialer under the TCPA. [*See Snyder Decls.*, DE 64-2; DE 64-3.]  In sum, if summary judgment is to be entered on this topic, it is that COAF's dialer does qualify as an autodialer, not the opposite.

### a)   COAF admitted (four times) that its system was an autodialer.

These admissions came well after cases it now cites in support of its newfound argument. Specifically, in response to this Court's interrogatories, COAF admitted that its telephone system was an autodialer.  [DE 16, 29, 40 & 41, No. 2.]  In response to Interrogatory 2: "**Were the calls made by an automatic dialer?**" Defendant answered: "COAF placed certain calls to Plaintiff with technology that meets the Federal Communications Commission's (FCC) current

interpretation of what constitutes an automatic telephone dialing system as defined by 47 U.S.C. § 227(a)(1)(A)." [*Def.'s Resp. to Ct. Interrogs.*, DE 16, No. 2; *Def.'s Am. Resp. to Ct. Interrogs.*, DE 29, No. 2; *Def.'s Second Am. Resp. to Ct. Interrogs.*, DE 40, No. 2].

COAF made this admission **four times** in its responses to Court-Ordered interrogatories. Three of those admissions were made months <u>after</u> the March 16, 2018 decision in *ACA Int'l.* [DE 29 (May 21, 2019); DE 40 (Sept. 14, 2018); DE 41 (Sept 17, 2018)]. Two of those admissions were even after *Gonzalez* was entered on September 5, 2018. [DE 40 & 41]. Two of the admissions were under oath. On November 9, 2018—two months after *Gonzalez* and almost eight months after *ACA Int'l*—COAF changed its sworn testimony, and for the first time denied that its system qualified as an autodialer [DE 51, No. 2]. COAF's change after giving sworn testimony and admissions should be highly scrutinized, especially given the timing of when those admissions occurred. Notably, COAF's change was on September 17, 2018. Yet, the majority of cases that COAF cites in its motion for summary judgment were entered well before this date. Citations to cases that were entered well before it filed its sworn admissions are especially suspect.[8]

  b)  <u>COAF ignores the split in authority post-*ACA Int'l*</u>

The Avaya Proactive Contact is a "predictive dialer." *Meyer v. Portfolio Recovery Assocs., LLC*, No. 11CV1008 AJB RBB, 2011 WL 11712610, at *3 (S.D. Cal. Sept. 14, 2011); *see also* Dec. 5, 2018; Snyder Decl., DE 64-2, ¶ 34. COAF now changes its position that its Avaya Proactive Contact dialer does not constitute an autodialer—relying primarily on the unpublished decision of *Gonzalez*, 2018 WL 4217065. However, *Gonzalez* changes nothing here. The holding in *Gonzalez* was based on *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018).

---

[8] Additionally, COAF did not seek leave from the Court to amend its interrogatories, seek permission from counsel, or even provide a reason for changing its sworn response. A party cannot simply change its interrogatory responses to a denial after admitting the answer in its first four submissions.

Pre *ACA Int'l*, it was indisputable that, based on the FCC's 2003, 2008, and 2015 declaratory rulings, a "predictive dialer" constituted an autodialer under the statutory definition of the TCPA. *See ACA Int'l* 885 F.3d at 701. After *ACA Int'l*, the courts are split. Some courts hold that *ACA Int'l* only invalidated the FCC's 2015 ruling (not 2003 or 2008) and, therefore, a predictive dialer indeed still constitutes an autodialer. *See, e.g.*, *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1321 (S.D. Fla. 2018). Others, such as *Gonzalez*, 2018 WL 4217065, held that *ACA Int'l* vacated the 2003 and 2008 orders as well, and thus "the question as to what devices are ATDSs is still unresolved…." *Id.* at *5. The *Gonzalez* court, which was ruling on a motion to dismiss, held that "the definition of an ATDS *would not include* a predictive dialer that lacks the capacity to generate random or sequential telephone numbers and dial them; but it *would include* a predictive dialer that has that capacity." *Id.* at *6. This is a similar holding to *Dominguez v. Yahoo, Inc.*, 894 F.3d 116 (3d Cir. 2018), both of which Defendant's motion is based on.

Yet, a new trending line of cases has emerged. After *Gonzalez* and *Dominguez* in the Ninth Circuit Court of Appeals decision of *Marks v. Crunch San Diego, LLC*, 904 F.3D 1041, 1053 (9th Cir. 2018). In *Marks*, the Ninth Circuit "decline[d] to follow the Third Circuit's unreasoned assumption [in *Dominguez* ] that a device must be able to generate random or sequential numbers in order to qualify as an ATDS." The Marks panel explained its conclusion:

> we conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a "random or sequential number generator," but also includes devices with the capacity to dial stored numbers automatically. Accordingly, we read § 227(a)(1) to provide that the term automatic telephone dialing system means equipment which has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers.

Several courts across the country have already adopted the *Marks* reasoning, including in *Adams v. Ocwen Loan Servicing, LLC*, 2018 WL 6488062, 366 F. Supp. 3d 1350 (S.D. Fla. Oct.

29, 2018) and *Getz v. DIRECTV, LLC*, 359 F. Supp. 3d 1222, 1229 (S.D. Fla. Feb. 20, 2019).  Yet, under all three lines of cases, the Avaya Proactive Contact is still an autodialer.

    c)  <u>Courts across the country, including courts within the Eleventh Circuit, hold that the system used here, the Avaya Proactive Contact, is an autodialer.</u>[9]

Just last month a federal district court held that the Avaya Proactive Contact System constituted an ATDS.  *Folkerts* 2019 WL 1227790, at *5 ("**the undisputed facts show that Defendant does own and employ an ATDS, the Avaya Proactive Contact System**.") (emphasis added).  Even though the *Folkerts* court followed the line of cases that Defendant supports, that a "predictive dialer…does not automatically qualify as an ATDS," it held that the Avaya Proactive Contact would *still* be considered an autodialer. *Id.* at *6-7. The court noted that "[c]ertainly, once the Avaya Proactive Contact System is employed, Defendant is able to make autodialed calls." *Id.* at *7 (N.D. Ill. Mar. 15, 2019).  Thus, even under the line of cases most favorable to COAF, its dialer is still an autodialer as a matter of law.[10]

Two courts within the Eleventh Circuit have ruled on this exact dialer finding that the Avaya Proactive Contact dialer is indeed an autodialer under the TCPA. In *Heard*, the Northern District of Alabama held that "Nationstar's system [(the Avaya Proactive Contact)] satisfies the TCPA's definition of an automatic dialer. . . . Mr. Heard is entitled to summary judgment on his TCPA claims for Nationstar's blast and predictive calls following the date on which Mr. Heard withdrew his consent." 2018 WL 4028116, at *7 (N.D. Ala. Aug. 23, 2018). In another case, the Northern District of Georgia held that the Avaya Proactive Contact dialer is an autodialer. *Evans*

---

[9] *See, e.g.*, *Folkerts v. Seterus, Inc.*, No. 17 C 4171, 2019 WL 1227790, at *5 (N.D. Ill. Mar. 15, 2019); *Heard v. Nationstar Mortg. LLC*, No. 2:16-CV-00694-MHH, 2018 WL 4028116, at *7 (N.D. Ala. Aug. 23, 2018); *Evans v. Pennsylvania Higher Educ. Assistance Agency*, No. 3:16-cv-82-TCB, 2018 WL 3954761, at *2-3 (N.D. Ga. June 12, 2018).

[10] Notably, the Court in *Folkerts* did not grant summary judgment only because the defendant did not actually use the Avaya Proactive Contact to make calls in that specific case, it used a different system.

2018 WL 3954761, at *2 (N.D. Ga. June 12, 2018) ("[b]ecause the Court finds AES used an ATDS as a matter of law, summary judgment will be granted to Evans on all thirty-five calls." *Evans* rejected similar arguments that COAF makes here. Finally, the Ninth Circuit has ruled that the Avaya Proactive Contact dialer is an autodialer.  In *Meyer v. Portfolio Recovery Associates*, 707 F.3d 1036 (9th Cir. 2012), the court reasoned that the defendant used a predictive dialer and that defendant did not dispute that the Avaya Proactive Contact dialer has the capacity to store or produce telephone numbers and to dial such numbers. *Id.* at 1043.

COAF makes the same losing argument as the defendants in *Heard*, *Evans*, and *Meyer* that the Avaya Proactive Contact dialer cannot be an autodialer because the dialer itself does not generate numbers but instead automatically calls numbers from an imputed calling list.  COAF even went a step further than the defendants in *Heard*, *Evans*, and *Meyer*: it admitted that its dialer was considered an autodialer on four separate occasions. For the same reasons outlined in the *Heard*, *Evans*, and *Meyer* cases, COAF's system used to place 996 calls to Mrs. Green-Mobley's cell phone from September 2013 through March 2016 is an autodialer.

   d)   Dialers used in predictive mode without human intervention are still autodialers

Courts all over the nation, including district courts within the Eleventh Circuit, continue to hold that dialers that dial numbers without human intervention are autodialers. *Glasser v. Hilton Grand Vacations Company, LLC*, No. 8:16-cv-952-JDW-AAS, 2018 WL 4565751 (M.D. Fla. Sept. 24, 2018); *Adams v. Ocwen*, No. 18-81028-CIV-DIMITROULEAS, 2018 WL 6488062 (S.D. Fla. Oct. 29, 2018); *Reyes v. BCA Fin. Servs., Inc.*, No. 16-24077-CIV-GOODMAN, 2018 WL 2220417, 312 F. Supp. 3d 1308, 1320 (S.D. Fla. May 14, 2018); *Ramos v. Hopele of Fort Lauderdale*, No. 17-62100-CIV-MORENO, 2018 WL 4568428 (S.D. Fla. Sept. 20, 2018; *Maddox v. CBE Grp., Inc.*, No.: 1:17-cv-1909-SCJ, 2018 WL 2327037 (N.D. Ga. May 22, 2018); *Swaney*

*v. Regions Bank*, No. 2:13-cv-00544-JHE, 2018 WL 2316452, at *2 (N.D. Ala. May 22, 2018); *Heard v. Nationstar Mortg. LLC*, No.: 2:16-cv-00694-MHH, 2018 WL 4028116 (N.D. Ala. Aug. 23, 2018).

Notably, COAF does not argue that there was human intervention in making calls with its Avaya Proactive Contact. The dialer was used to place calls to Mrs. Green-Mobley in predictive mode and make calls without human intervention.   [*See* Dec. 5, 2018 Declaration of Randall Snyder, DE 64-2; *see* next section.] It has the capacity to generate sequential numbers and dial them. *Id.* ¶ 35.  COAF admits that it used the Avaya Proactive Contact dialer in predictive dialing mode.[11] Accordingly, the Avaya Proactive Contact dialer is an autodialer under the TCPA.

e)   The facts here indicate that the dialer is an autodialer.[12]

COAF's policies and procedures illustrate its ATDS features.   The following excerpts attached as Composite Exhibit J are merely a very small portion of autodialer characteristics and functionalities listed within the thousands of pages COAF produced:

> ***Run Jobs Without Agents***: Determine if the job is a Virtual Agent job. ***The dialer runs the job without agents***. [*Def.'s Bates 006654*].

> ***You can specify the jobs that must be run automatically***. . . . The auto_start jobs script is called from crontab to ***automatically start the specified jobs***. [*Def.'s Bates 006672*].

> If you enter a time that is earlier than the recommended start time, ***the dialer does not dial the phone numbers until the system clock reaches the recommended time*** [*Def.'s Bates 006639*].

---

[11] Specifically, COAF's expert affirmatively states that "[COAF] **did** use Proactive Contact prior to April 2016 in predictive dialing mode," [*Dep. Tr. of J. Kostyun*, 103:10-13, Ex. E (emphasis added)], and "COAF admits that at certain times during the relevant time period in this case, **calls were placed without a COAF employee manually dialing each number**." [*Def.'s Resp. to Pl.'s Third Req. for Admis.*, No. 49, Ex. D (emphasis added)].

[12] Until March 31, 2016 – the date in which COAF switched to the Avaya one-X dialer – COAF referred to the APC dialer's "previous state" of its dialing method as "Auto-Dialer Dialing." [*Ex. 28 of E. Gray Dep. Tr.*, Ex. H]. From April 1, 2016, to present, COAF refers to its "current state" of its dialing method as "Manual Dialing." [*Ex. 29 of E. Gray Dep. Tr.*, Ex. I].  According to COAF's own policies and procedures, "COAF decommissioned [its] autodialer technology after switching to an all-manual calling environment" in response to a 2015 FCC TCPA ruling. [*Ex. 27 of E. Gray Dep. Tr.*, Ex. K].

> *A system retry is a computer generated phone call attempt*. If the system detects a busy signal on the first call attempt, *the system dials the phone number based on the retry parameters in the phone strategy*. [*Def.'s Bates 006601*].
>
> Determine if you want to save the quota setting when the job ends. *The system continues using the quota setting the next time the job starts*. [*Def.'s Bates 006644*].

*See* Additional in Composite Exhibit J. As outlined above, the Avaya Proactive Contact dialer runs without agents and automatically dials numbers based on a set of parameters.  It will not dial certain numbers until the clock reaches a specific time predetermined by dialing rules.  Further, a system retry is a "computer generated phone call attempt." [*Def.'s Bates 006642*, Ex. L].  The evidence proves that the Avaya Proactive Contact dialer is an autodialer.

f) <u>COAF admits it called Mrs. Green-Mobley at least 53 times using a prerecorded and/or artificial voice in violation of the TCPA.</u>

Use of a prerecorded message or artificial voice in calls to consumers cell phones is a separate, direct violation of the TCPA. *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1325 (S.D. Fla. 2018).[13] Defendant agrees that this is the ultimate issue: "Plaintiff cannot prevail on her TCPA claim absent proof that the calls at issue were made using an ATDS **or an artificial or prerecorded voice.**" [*Def.'s Mot.*, p. 20 of 34 (emphasis added)]. In the same breath, COAF admits to using a prerecorded and/or artificial voice to call Mrs. Green-Mobley at least 53 times.[14] This admission alone satisfies element two of the TCPA (at least to 53 calls) regardless of the split of authority on an autodialer and precludes summary judgment. *See Gonzalez*, 2018 WL 4217065, at *7.

3) ***Element Three:  Mrs. Green-Mobley Expressly Revoked Consent to Receive Calls.***

---

[13] Unlike the plaintiff in *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1325 (S.D. Fla. 2018), Mrs. Green-Mobley specifically alleged in her complaint that "CAPITAL ONE called [her] using an automatic telephone dialing system and/or used a pre-recorded or artificial voice." [*Compl.*, DE 1, ¶ 64; *see also* ¶ 59].

[14] [DE 64, p. 7 of 34 ("COAF does not dispute that, before April 1, 2016, it made 53 calls to Plaintiff's cellphone where a prerecorded message was left and/or a prerecorded or artificial voice was used.")].

From September 2013 through May 2017, Mrs. Green-Mobley sent COAF at least seven written revocation letters, and COAF's unsubstantiated denial of receipt cannot overcome the presumption of COAF's receipt.[15]

    a)  <u>COAF cannot rebut the presumption that it received the revocation letters.</u>

Courts in this circuit place a "presumption of receipt" on letters if the plaintiff can demonstrate the following three "facts," (1) mailing was properly addressed, (2) it had sufficient postage, and (3) was deposited in the mail. *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996) "The common law has long recognized a rebuttable presumption that an item properly mailed was received by the addressee." *Konst v. Fla. E. Coast Ry. Co.*, 71 F.3d 850, 851 (11th Cir. 1996); *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1238 (11th Cir. 2002).

"A party's failure to uncover an item, which it was presumed to have received, does not mean that it never received the item and does not rebut the presumption of delivery." *MRI Assocs. of St. Pete, Inc. v. Dairyland Ins. Co.*, No. 811-CV-665-T-30MAP, 2014 WL 29103, at *2 (M.D. Fla. Jan. 2, 2014) (quoting *Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1241, (11th Cir. 2002)). Bare assertions and unsubstantiated denials do not rebut the presumption of receipt. *Dairyland Ins. Co.*, 2014 WL 29103, at *2; *Desravines v. Orange Cty. Sheriff's Office*, No. 6:10-CV-0851-28GJK, 2011 WL 6937471, at *4 (M.D. Fla. Nov. 4, 2011).

Plaintiff has met her burden to establish a presumption of receipt. She asserted in her complaint that she sent COAF multiple revocation letters requesting COAF stop calling her. [*Compl.*, DE 1, ¶¶ 21-43] and also provided evidence that she (1) properly addressed the letters,

---

[15] There is also a significant amount of evidence regarding the letters that cannot be added due to page limits. Specifically, metadata from Plaintiff's computer and subpoenas to third parties prove the existence of the letters and that they were created/scanned in at or near the dates of when they were sent. Additional evidence will be submitted with Plaintiff's MSJ.

(2) provided sufficient postage, and (3) deposited the letters in the mail. COAF has not provided any evidence to rebut the presumption.

i.    *First Letter.* Mrs. Green-Mobley mailed the First Letter to COAF on September 15, 2013. It stated, "I request that all communication be sent in writing by either e-mail or US postal mail to the address above, as it does no good for me to get bombarded with telephone calls if my situation has not changed and I am unemployed." [*Pl.'s First Ltr.*, DE 1-2].[16]   The Letter was properly addressed and sent to "7933 Preston Road, Plano, Texas 75024" (the "Preston Road Address"). [DE 1-2].[17] Defendant cannot rebut the presumption of receipt. Defendant argues that it has "no record of receiving this alleged September 15, 2013 letter." [DE 65, p. 8 of 34], and that the Plano, Texas address "was not a proper mailing address for COAF in September 2013." *Id.* The bare assertion and unsubstantiated denial certainly do not overcome presumption of receipt.

ii.    *Second Letter.* Mrs. Green-Mobley mailed the Second Letter in "either January or February of 2014." Although Mrs. Green-Mobley does not have a copy of the Second Letter in her possession, she testified as to mailing the Second Letter to COAF "noting her unemployment and requesting all communications in writing." [*Pl.'s Supp. Resp. to Ct.-Ordered Interrogs.*, DE 52, No. 10]. Defendant's bald assertion and unsubstantiated denial that "COAF has no record of receiving [the letter]" [DE 65, p. 9 of 34] cannot rebut the presumption of receipt.

iii.    *Third Letter.* Plaintiff mailed the Third Letter to COAF on January 14, 2015. She addressed

---

[16] COAF does not dispute that the language above in the First Letter is a Do-Not-Call request. [*Dep. Tr. of E. Gray*, 119:3-4, Ex. F; *Dep. Tr. of K. Lawson*, 82:5-16, Ex. N].

[17] This was COAF's correct address. [*See Def.'s Resp. to Pl.'s Third Req. for Admis.*, Nos. 1, 2, 3, 19, 20, attached as Ex. D, ("pursuant to COAF practices and procedures, mail addressed to COAF and sent to 7933 Preston Road, Plano, Texas 75024 in September 2013 should have been routed and delivered to the proper COAF location depending on the nature and type of the mail received."); *Def.'s Resp. to Pl.'s Second Req. for Admis.*, No. 14, Ex. M, ("COAF admits that 7933 Preston Road Plano, Texas 75024 was a COAF address beginning in 2013 and that it remained a COAF address through June 17, 2017.")]. Mrs. Green-Mobley's daughter-in-law, Amy Green testified that she witnessed Mrs. Green-Mobley mail the First Letter at the post office because she was with Mrs. Green-Mobley when she mailed it. [*Dep. Tr. of A. Green*, 53: 11-13, Ex. O].

the Third Letter to COAF at "P.O. Box. 60511, City of Industry, California 91716-0511." [*Pl.'s Bates 000225*, attached as Ex. P]. The Third Letter stated, "[p]lease refrain from calling my telephone and send all correspondence via US mail." [*Pl.'s Bates 000225*, Ex. P].  Plaintiff noted shortly thereafter that she sent the letter to COAF revoking consent.[18] Defendant attempts to rebut the presumption by stating that "Plaintiff again cannot recall what address she put on the mailing envelope . . . [and] COAF, again, has no record of receiving it." [DE 65, p. 9 of 34].  However, Plaintiff produced the Third Letter, which contained a valid address; COAF's bald assertion and unsubstantiated denial that it did not receive the letter cannot overcome the presumption of receipt.

iv.    *Fourth Letter.* Plaintiff mailed the Fourth Letter to COAF in September 2016. Although Mrs. Green-Mobley does not have a copy of the Fourth Letter in her possession, "Ms. Green-Mobley recalls sending a letter to Capital One noting her unemployment, requesting all communication in writing and providing a new mailing address of 6818 Mikayla Lane Cordova, TN 38018." [*Pl.'s Supp. Resp. to Ct.-Ordered Interrogs*., DE 52, p. 6, No. 9].  Further, "Ms. Green-Mobley mailed the September 2016 letter on or about September 2016, to the following address: 7933 Preston Road, Plano, Texas 75024." *Id.* COAF states that it "has no record of receiving the letter." [DE 65, p. 9 of 34].  Again, COAF's bald assertion and unsubstantiated denial cannot overcome the presumption of receipt that Mrs. Green-Mobley is entitled to.

v.    *Fifth Letter.* Plaintiff mailed another revocation letter to COAF on or about February 13, 2017. [*Aff. of Pl.*, ¶ 18; DE 1-5; *Pl.'s Dep. Tr.*, DE 72-2, 12:7-11; 15:11-25; 16:1-12; 287:14-15]. The Fifth Letter was properly addressed and mailed  to "7933 Preston Road, Plano, Texas, 75024."

---

[18] On March 21, 2016, Mrs. Green-Mobley wrote a note in her call blocking application following a call Mrs. Green-Mobley received from COAF.  Mrs. Green-Mobley's contemporaneous note entry stated, "I sent letter a month ago asking that communication be in writing. I spoke to them. Twice last week, made payment arrangement, then spoke to them yesterday to make arrangement for Friday and they call. Me back today and everyday. It is beyond harassment." [*Pl.'s Bates 000076*, Ex. Q].

[DE 1-5]. The letter requested that COAF "[p]lease provide communications via US mail, as it does not good for your representatives to bombard me with phone calls when I have clearly explained my circumstances." [DE 1-5].[19]  With the Fifth Letter, Mrs. Green-Mobley mailed a February 1, 2017 Repayment Letter ("Repayment Letter") and a money order in the amount of $50.00 ("February Money Order").   Mrs. Green-Mobley testified that "the money order was folded, as I showed you earlier today, this morning, inside of the letters – the two letters.  The money order was in side [sic] of the two letters." [*Pl.'s Dep. Tr.*, DE 72-2, 368:14-17].  Mrs. Green-Mobley produced a physical copy of the February Money Order receipt showing that COAF cashed the February Money Order. [*Ex. 5 of Pl.'s Dep. Tr.*, attached as Ex. R].

"COAF admits that it received a $50.00 money order bearing the number 17-551392609 and applied a $50.00 payment to the loan ending in -3203 on or about February 21, 2017." [*Def.'s Resp. to Pl.'s First Req. for Admis.*, DE 38-7, No. 22]. Yet COAF also states that "COAF has no record of receiving any letter with the February money order." [DE 65, ¶ pp. 10-11 of 34]. Again, COAF's bald assertion and unsubstantiated denial cannot overcome the presumption of receipt that Mrs. Green-Mobley is entitled to, especially when it cashed the accompanying money order.

vi.    *Sixth Letter.* Mrs. Green-Mobley mailed the Sixth Letter to COAF on or about March 17, 2017.[20] Mrs. Green-Mobley properly addressed the Sixth Letter to "7933 Preston Road, Plano, Texas, 75024." [*Pl.'s Sixth Ltr.*, attached as Ex. S].  The Sixth Letter requested that COAF "[p]lease provide communications via US mail, as it does not good for your representatives to bombard me with phone calls when I have clearly explained my circumstances." [*Pl.'s Sixth Ltr.*,

---

[19] On February 23, 2017, Mrs. Green-Mobley wrote a note in her call blocking application following a call Mrs. Green-Mobley received from COAF.  Mrs. Green-Mobley's contemporaneous note entry stated, "I have sent letters explaining unemployment and requesting communication via writing and they continue to call since August 2016. Last letter was sent this month with request for payment arrangement." [*Pl.'s Bates 000076*, Ex. Q].

[20] Mrs. Green-Mobley produced the Sixth Letter on August 22, 2018, via E-mail to COAF through counsel in electronic Word Document format.  The metadata from the electronic Word Document is identical to the metadata from the Fifth Letter because Mrs. Green-Mobley used the same template for the remaining letters.

Ex. S].[21]  Plaintiff folded another money order (the "March 2017 Money Order") inside the Sixth

Letter and the Repayment Letter.[22]  She  also produced a physical copy of the March 2017 Money

Order receipt showing that COAF cashed the it. [*Ex. 5 of Pl.'s Dep. Tr.*, attached as Ex. R].  "COAF

admits that it received a $50.00 money order bearing the number 17-535355086 and applied a $50

payment to the loan ending in -3203 on or about March 24, 2017." [*Dep. Tr. of E. Gray*, 234: 23-

25; 235:1; 123:4-16, Ex. F; *Def.'s Suppl. Resp. to Pl.'s First Req. for Admis.*, No. 25, Ex. T].

COAF also admits that it received the Sixth Letter and the Repayment Letter. [*Def.'s Resp. to Pl.'s*

*Third Req. for Admis.*, No. 25, Ex. D; *Money Orders*, Composite Ex. U].

Despite receiving the Repayment Letter, March 2017 Money Order, and the Sixth Letter,

COAF did not notate Mrs. Green-Mobley's Account that it received the Sixth Letter or the

Repayment Letter.  According to COAF, it "did not process the March 2017 letter correctly"

because "what the agent should have done [was] transferred that to the  -- at that time, Do Not Call

team to process and did not."  [*Dep. Tr. of E. Gray*, 180:19-20; 118:8-15; 119:3-7; 181:1-3, Ex.

F].  "COAF admits that Plaintiff's account was not coded do-not-call [or 'cease and desist'] on

March 17, 2017." [*Def.'s Resp. to Pl.'s Third Req. for Admis.*, Nos. 58, 59, Ex. D]. COAF admits

to receipt of the Do-Not-Call request, yet continued to call. [*See* MSJ, DE 65, p. 16 of 34.]

vii.    *Seventh Letter.* Mrs. Green-Mobley mailed the Seventh Letter to COAF on or about May

12, 2017. Again, "[i]n this packet, [Mrs. Green-Mobley] sent [the Seventh] letter, [she] sent a copy

of the letter from Capital One stating the balance that [she] owed [(the Repayment Letter)], and

---

[21] COAF classifies the Sixth Letter as a Do-Not-Call request. [*Dep. Tr. of E. Gray*, 118:8-15; 119:3-7, Ex. F].

[22]  Plaintiff testified that she has a habit of keeping up with paperwork as follows:
    A. "I keep all of my paperwork."
    Q. And when you say "paperwork," what would that entail?
    A. A copy of these letters that I sent, a copy of the money order receipts.
[*Pl.'s Dep. Tr.*, DE 72-2, 25:5-10].

[she] sent the money order [("May 2017 Money Order")]." [*Pl.'s Dep. Tr.*, DE 72-2, 21:2-11].[23] The Seventh Letter requested that COAF "[p]lease provide communications via US mail, as it does not good for your representatives to bombard me with phone calls when I have clearly explained my circumstances." *Id.* Mrs. Green-Mobley addressed the Seventh Letter to "7933 Preston Road, Plano, Texas, 75024." *Id.*

Mrs. Green-Mobley also produced a physical copy of the May 2017 Money Order receipt showing that COAF cashed the May 2017 Money Order. [*Ex. 6 of Pl.'s Dep. Tr.*, attached as Ex. W]. COAF admits that it received a $50.00 money order bearing the number 17-585560571 and applied a $50.00 payment to the loan ending in -3203 on or about May 23, 2017 because after Mrs. Green-Mobley's deposition where she produced the Seventh Letter, Repayment Letter, and May Money Order, COAF produced the May 2017 Money Order together with the Repayment Letter. [*Dep. Tr. of E. Gray*, 123:8-16, Ex. F; *Money Orders*, Composite Ex. U].[24] However, despite receiving the Repayment Letter, COAF did not notate Mrs. Green-Mobley's Account that it received any correspondence from her. [*Dep. Tr. of K. Lawson*, 50:16-17, Ex. N ("So I – I don't know why this is not notated that – that we received this in the envelope.")]. Defendant states that it "received only its own February letter with the May money order (with no letter from Plaintiff)." [DE 65, pp. 10-11 of 34]. Unfortunately for COAF, an unsubstantiated denial of receipt does not overcome the presumption that COAF received Mrs. Green Mobley's letters.

Mrs. Green-Mobley has produced a significate amount of evidence that she (1) properly addressed, (2) provided sufficient postage for, and (3) deposited each revocation letter in the mail;

---

[23] Mrs. Green-Mobley produced a physical copy of the Seventh Letter[23] (together with the Repayment Letter). [*Ex. 7 of Pl.'s Dep. Tr.*, attached as Ex. V].

[24] Notably, COAF did not produce the Seventh Letter itself, which was enclosed with the Repayment Letter and May Money Order.

she is entitled to a presumption that COAF received the letters. Defendant's only response to Mrs. Green Mobley's evidence of receipt is a bald assertion that it did not receive the Do-Not-Call requests and an unsubstantiated denial of receipt. Unfortunately for COAF, such evidence does overcome the presumption that COAF received all of Mrs. Green-Mobley's revocations.

     **b)** <u>COAF's flawed recordkeeping does not rebut the presumption of receipt.</u>

COAF argues that "[i]f any other letters had been received by COAF, a record of those letters would have been scanned and noted in the record for Plaintiff's account and also recorded in the activity notes report, per COAF's standard policies, practices and procedures. Pursuant to COAF's standard policies, practices and procedures, Plaintiff's account also would have been coded to stop further calls being made on the account." [*Def.'s Mot.*, p. 14]. Notably, however, as mentioned previously, COAF's position from the beginning of litigation was that COAF did not receive **any** of the seven (7) letters from Mrs. Green-Mobley.

Nearly a year and a half later, COAF, after a "diligent search," dug up the Sixth Letter along with the Repayment Letter that was enclosed with the Sixth Letter and the Seventh Letter. [*Def.'s Bates 006451-52; 006454*, Ex. X]. COAF alleges that it processed the Sixth Letter "incorrectly" but later found the Sixth Letter in a batch of images with other correspondence. [*Dep. Tr. of E. Gray*, 180:19-20; 118:8-15; 119:3-7; 181:1-3, Ex. F]. Despite COAF's policies and procedures, neither the Sixth Letter nor the Repayment Letter enclosed with the Sixth Letter was recorded in the activity notes report, and Mrs. Green-Mobley's Account was not coded to stop further calls from being made on the Account. [*Def.'s Resp. to Pl.'s Third Req. for Admis.*, Nos. 58, 59, Ex. D]. Likewise, the Repayment Letter enclosed with the Seventh Letter was not recorded in the activity notes report. [*Dep. Tr. of K. Lawson*, 50:16-17, Ex. N]. Approximately five months later, after the discovery period expired and after COAF, again, alleged that it conducted a "diligent

search," COAF found 105 additional call recordings that Mrs. Green-Mobley repeatedly asked for but was told did not exist. [DE 73; DE 76].[25]  As illustrated, COAF continues to uncover material evidence despite its repeated contention that it conducted a "diligent search."  Therefore, COAF's reliance on its policies and procedures should be afforded no weight.

## B.  COAF VIOLATED THE FCCPA

The FCCPA, Florida Statute Section 559.72, prohibits a significant amount of conduct pertaining to calls, one of which is calling times. Fla. Stat. § 559.72(17).  In its Motion, COAF alleges that it "did not make any collection calls on Plaintiff's account before 8:00 a.m. or after 9:00 p.m. **in the two years before this action was filed.**" [*Def.'s Mot.*, DE 65, p. 9 of 34 (emphasis added)].  This is only half of the relevant time period.  This action was filed in 2017, and the calls at issue here began in 2013.  Thus, COAF cannot even make a serious FCCPA argument.

Additionally, COAF violated Florida Statute Section 559.72(7) of the FCCPA by calling Mrs. Green-Mobley's cell phone over 1100 times to harass her. *See Story v. J.M. Fields, Inc.*, 343 So. 2d 675, 677 (Fla. 1st DCA 1977) (holding that 100 debt collection calls made over a five-month period was sufficient to present a jury question).[26]  Florida Statute section 559.72(7) prohibits "[w]illfully communicat[ing] with the debtor or any member of her or his family with such frequency as can reasonably be expected to harass the debtor or her or his family, or willfully engage in other conduct which can reasonably be expected to abuse or harass the debtor or any

---

[25] To put this into perspective, prior to producing the 105 additional call recordings, COAF had only produced thirty-one (31) call recordings in total.

[26] Despite COAF's argument that Mrs. Green-Mobley did not answer a number of phone calls, COAF violated the TCPA with each and every phone call placed to Mrs. Green-Mobley's cell phone after she revoked consent to be called. *Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008) ("'The TCPA is essentially a strict liability statute' where liability can be found for erroneous unsolicited faxes") (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co.*, 314 F. Supp. 2d 1094, 1103 (D. Kan. 2004)); *see also Whitehead v. Ocwen Loan Servicing, LLC*, No: 2:18-cv-470-FtM-99MRM, 2018 WL 5279155, at *4 (M.D. Fla. Oct. 24, 2018) (citing *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011)).

member of her or his family." Fla. Stat. § 559.72(7). Furthermore, as the Middle District of Florida

just recently held

> the FCCPA is not violated where the creditor called only to inform
> or remind the debtor of the debt, to determine his reasons for
> nonpayment, to negotiate differences or to persuade the debtor to
> pay without litigation. However, if calls 'continue after all such
> information has been communicated and reasonable efforts at
> persuasion and negotiation have failed,' then the communication
> 'can reasonably be expected to harass the debtor' and 'tends only to
> exhaust the resisting debtor's will.

*Karandreas v. Loancare, LLC*, No. 618-CV-1411ORL40TBS, 2019 WL 1383296, at *3 (M.D.
Fla. Mar. 27, 2019) (internal quotations and citations omitted).

Here, there is no doubt that COAF harassed Mrs. Green-Mobley.  COAF admits that "1,100

calls were made to Plaintiff's 6433 number on the Account between July 6, 2013 and July 6, 2017"

and that "COAF's Activity Notes further provide that [] additional calls were made on the Account

between July 6, 2013 and July 6, 2017 . . . ." [*E. Gray Decl.*, DE 65-1, ¶¶ 18-19].  Here, the calls

occurred multiple times in one day for three and a half years.  COAF sometimes called Mrs. Green-

Mobley up to five times in one day, regardless of her telling COAF's agents that she would not be

able to pay COAF until a certain date when she received her paycheck.

The harassment and lack of bona fide error involve the same facts.  In one specific instance,

Mrs. Green-Mobley notified COAF on July 14, 2014, that she would not receive her paycheck

from a new job until August.  On July 19, 2014, COAF called Mrs. Green-Mobley again.  During

this call, Mrs. Green-Mobley notified COAF that she would not receive her first paycheck from

her new job until August 15, 2014.  COAF advised Mrs. Green-Mobley to try to find the funds.

On July 23, 2014, Mrs. Green-Mobley again advised COAF that nothing has changed since

yesterday.  Mrs. Green-Mobley again advised COAF that she could not make a payment until

August 15, 2014.  On July 24, 2014; July 25, 2014; July 26, 2014; July 27, 2014; and July 28,

2014, Mrs. Green-Mobley advised COAF, yet again, that she would make a payment on August 15, 2014.  In between all these calls, COAF made at least another fifteen (15) calls in an attempt to harass Mrs. Green-Mobley when Mrs. Green-Mobley clearly informed COAF of her circumstances.  COAF acknowledges that received her March 2017 revocation letter, and then still called her an additional 13 times. [*See* DE 65, p. 16 of 34.]  There is no bonafide error here, just pure harassment.  Actual damages are clear from Plaintiff's testimony.

**CONCLUSION**

WHEREFORE, Plaintiff, Toya Green-Mobley, respectfully requests this Court deny COAF's Motion for Summary Judgment in its entirety and award attorney's fees and costs, and any other relief this Court deems equitable, just, or proper.[27]

Respectfully submitted,
**DAVIS LAW FIRM**

*s/Ariel R. Spires*
**TODD M. DAVIS, ESQ.**
FL BAR NO. 58470
TD@DavisPLLC.com
**ARIEL R. SPIRES, ESQ.**
FL BAR NO. 0124523
aspires@DavisPLLC.com
231 E. Adams Street
Jacksonville, FL 32202
904-355-9610 (T)
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 25, 2019, I E-filed this document using the Court's CM/ECF system, which will send notice to counsel of record.

*/s/Ariel R. Spires*
Ariel R. Spires

---

[27] Although at first glance this response appears to exceed the page limit, it does not.  The case style, filer's signature block, and certificate of service do not count toward the page limit set for the filing. *Morgan v. Ace Am. Ins. Co.*, No. 3:16-cv-705-J-39MCR, 2016 WL 9211667, at *1 (M.D. Fla. September 7, 2016).